**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard Michael KING, aka Richard Hansen,\* Defendants-Appellants.**

**Nos. 72–1593, 72–1628, 72–1594 to 72–1602.**

United States Court of Appeals, Ninth Circuit.

Feb. 28, 1973.

---

\* Consolidated with U. S. v. Paul A. Vesco, Jr., No. 72–1628; U. S. v. James Leo Olson, No. 72–1594; U. S. v. John Fahlen, No. 72–1595; U. S. v. John Ferris Pope, No. 72–1596; U. S. v. Virginia Marie Pope, No. 72–1597; U. S. v. Gordon Ardel Maack, No. 72–1598; U. S. v. Miki Dee Thieda, No. 72–1599; U. S. v. James Russell Vukich, No. 72–1600; U. S. v. Carole J. Swisher, No. 72–1601; U. S. v. Robert Craig Light, No. 72–1602.

Paul G. Evans (argued), La Jolla, Cal., Michael S. Hegner (argued), San Diego, Cal., Douglas R. Reynolds (argued), of Holt, Rhoades & Hollywood, San Diego, Cal., Kevin J. McInerney (argued), of McInerney, Milchen & Frank, San Diego, Cal., Artie G. Henderson (argued), San Diego, Cal., Charles R. Khoury, Jr. (argued), San Diego, Cal., Mobley M. Milam, William Zumwalt, James Hagerstrom, of Public Defenders, Inc., Frank V. Gregorcich, San Diego, Cal., for defendants-appellants.

E. Mac Amos, Asst. U. S. Atty. (argued), Stephen G. Nelson, Asst. U. S. Atty., Harry D. Steward, U. S. Atty., San Diego, Cal., John J. Robinson, Atty., Dept. of Justice (argued), Washington, D. C., for plaintiff-appellee.

Before DUNIWAY and HUFSTEDLER, Circuit Judges, and JAMESON,** District Judge

DUNIWAY, Circuit Judge:

King and ten others appeal from their convictions under 21 U.S.C. §§ 176a, 841, 846, 952, 960, 963 of conspiring to illegally import and to distribute marijuana in the United States. Various of the defendants were also convicted under 18 U.S.C. § 1403(a) for using communications facilities in furtherance of the conspiracy. The government's case was largely derived from a tap of King's telephone, purportedly conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (the Act), 18 U.S.C. §§ 2510–20.

We hold that defendants Light and Virginia Pope do not have standing to challenge the legality of the wire-tap, and affirm their conspiracy convictions. We reverse the convictions of the other defendants.

I. *Validity of the wire-tap.*

■ The principal issue in this case is the validity of the wire-tap of King's telephone. The defendants make a shotgun challenge to the legality of the tap, arguing that its fruits should be suppressed pursuant to 18 U.S.C. § 2515. Having concluded that the wire-tap was improperly authorized, we deal only with that contention. We first set out the relevant provisions of the Act, and then compare them with what was done in these cases.

A. *The requirements of the Act.*

Section 2511 outlaws all wire-tapping, and all disclosures of tapped communications, except for those specifically authorized by the Act. Section 2512 outlaws wire-tapping devices, mailing or transporting them in interstate commerce, and advertising them, with certain specific exceptions. Both sections prescribe substantial criminal penalties. Section 2513 authorizes confiscation of unlawful devices.

Section 2515 provides, in pertinent part:

*"Prohibition of use as evidence of intercepted wire or oral communications.*

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . .

. . . . . .

. . . if the disclosure of that information would be in violation of this chapter."

** Honorable William J. Jameson, United States District Judge, District of Montana, sitting by designation.

And Section 2518(10)(a) implements Section 2515:

"Any aggrieved person in any trial, hearing, or proceeding in or before any court . . . of the United States . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that—

 (i) the communication was unlawfully intercepted;

 (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

 (iii) the interception was not made in conformity with the order of authorization or approval."

Sections 2516–18 contain elaborate provisions for the authorization of wire-taps in criminal investigations. They are restrictive rather than expansive in their terms. Section 2516 limits the use of wire-taps to investigations of certain crimes only. Section 2517 provides for limited use of intercepted communications by law enforcement officers. Section 2518 prescribes, in elaborate and generally restrictive detail, the contents of applications for orders authorizing wire-taps, the findings to be made by the judge to whom application is made, the contents of his order, and restrictions upon what may be intercepted and how the order may be carried out. We quote the provisions of these sections directly pertinent to this case.

Section 2516(1) provides:

"(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize the application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications." [1]

Section 2518(1) provides:

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

 (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

 (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communication sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

 (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

 (d) a statement of the period of time for which the interception is required to be maintained. . . ."

Subsection (3) of Section 2518 prescribes the findings that the judge must make. In essence, they track the quoted provisions of subsection (1). Subsection (4) prescribes, in considerable detail, the contents of the judge's order

---

1. 28 U.S.C. § 506 provides:
"The President shall appoint, by and with the advice and consent of the Senate, nine Assistant Attorneys General, who shall assist the Attorney General in the performance of his duties."

approving a tap. These also track the provisions of subsection (1), and include the following:

"(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; . . . ."

Subsection (5) contains provisions limiting the duration of any authorized tap, including the following:

"Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."

Subsections (8) and (9) prescribe methods of assuring the accuracy of transcriptions of what is heard, preservation of records, and preconditions to their use in evidence.

### B. *What happened in this case.*

On March 20, 1971 Charles Fanning, an attorney of the Department of Justice, applied to the District Court for the Southern District of California for an order authorizing a tap of King's telephone.[2] The application recites:

"3. Pursuant to the powers conferred on him by Section 2516 of Title 18, United States Code, the Attorney General of the United States, the Honorable John N. Mitchell, has specially designated in this proceeding the Assistant Attorney General for the Criminal Division, the Honorable Will Wilson, to authorize affiant to make this application for an order authorizing the interception of wire communications. The letter of authorization signed by the Assistant Attorney Gen-

eral is attached to this application as Exhibit A."

The attached letter addressed to Fanning, reads:

"This is with regard to your request for authorization to make application pursuant to the provisions of Section 2518 of Title 18, United States Code, for an order of the court authorizing the U.S. Customs Agency Service to intercept wire communications to and from telephone number 714–233–8650, subscribed to by Richard Michael King under the name of Richard Hansen and located in the residence of Richard Michael King, address 2002 First Avenue, Apartment No. 3, San Diego, California, in connection with the investigation into possible violations of 21 U.S.C. 176a by Richard Michael King and others as yet unknown.

"I have reviewed your request and the facts and circumstances detailed therein and have determined that probable cause exists to believe that Richard Michael King and others as yet unknown have committed and are committing offenses enumerated in Section 2516 of Title 18, United States Code, to wit: violations of 21 U.S.C. 176a. I have further determined that there exists probable cause to believe that the above person will make use of the above-described telephone in connection with those offenses, that wire communications concerning the offenses will be intercepted, and that normal investigative procedures are unlikely to succeed.

"Accordingly, you are hereby authorized under the power specially delegated to me in this proceeding by the Attorney General of the United States, the Honorable John N. Mitchell, pursuant to the power conferred on him by Section 2516 of Title 18,

---

2. In this case, there were four applications for wire-tap orders and four orders. The first initiated the tap; the other three extended the time during which the tap could be maintained. So far as it is ma-

terial, the documentation in support of each was substantially identical. We therefore confine our statement of the facts to the first application and order.

United States Code, to make application to a judge of competent jurisdiction for an order pursuant to Section 2518 of Title 18, United States Code, authorizing the U.S. Customs Agency Service to intercept wire communications from the above-described telephone for a period of twenty (20) days.

Sincerely,
S/ Will Wilson
WILL WILSON
Assistant Attorney General"

On its face, this letter complies with the Act. Whoever composed it had obviously studied the Act and framed the letter accordingly.

The problem arises from the fact that practically everything stated in the letter is false. Wilson did not sign it. He never saw it. He never saw Fanning's request, or any request, much less reviewed it. He made none of the determinations recited in the second paragraph. Attorney General Mitchell did not specially delegate to him any power to act in this case. In short, the District Judge who issued the order was "had".

When these facts came to light, the government filed affidavits which state what actually happened. One is by Harold P. Shapiro, Deputy Assistant Attorney General in the Criminal Division of the Department of Justice. Shapiro states:

"Prior to action on each request, the respective Departmental working file, which included copies of the proposed affidavit, application, and order, was reviewed in a special unit of the Organized Crime and Racketeering Section of the Criminal Division by an attorney whose primary function was to review the entire matter for form and substance with particular empha-

sis on assuring strict adherence to the required statutory, judicial and Constitutional standards. The attorney of that unit handling the requests, Philip T. White, reviewed the files and recommended favorable action on each request. In its turn, each file was then submitted for review to Edward T. Joyce, a Deputy Chief of the Organized Crime and Racketeering Section, who recommended approval of its request and sent it to me. I examined each file and forwarded it to the office of the Attorney General with a detailed recommendation that the authorization be granted. Following approval in the Office of the Attorney General, the Criminal Division dispatched the letters dated March 19, April 8, April 21, and April 29, 1971, to Charles J. Fanning advising him that he was authorized to present the applications to the court.

"I signed Will Wilson's name to the letters of March 19, April 8, April 21 and April 29, 1971, in accordance with the authorization of Will Wilson and the standard procedures of the Criminal Division. I regarded the signing of Will Wilson's name as a ministerial act, because Will Wilson had authorized me to sign his name and to dispatch such a letter of authorization in every instance in which the request had been favorably acted upon in the Office of the Attorney General." [3]

A second affidavit is by Attorney General Mitchell. This is what he says:

"Shortly after taking office, I determined to utilize the authority granted by Congress in 18 U.S.C. 2510–2520 (Title III of the Omnibus Crime Control and Safe Streets Act of 1968) to conduct electronic surveillance under court authorization in the investigation of certain criminal activities.

---

3. Attached to the Shapiro affidavit is an affidavit by Will Wilson which says:

"I have authorized Deputy Assistant Attorney General Henry E. Petersen and Deputy Assistant Attorney General Harold Shapiro to sign my name to let-ters of authorization for application to United States District Courts for orders under Title 18, United States Code, Section 2518, after such application had been approved by the Attorney General."

"I established a procedure whereby all requests for authorization to apply for wire interception orders are subject to intensive review in the criminal Division of the Department of Justice and each of the requests in which the Criminal Division concurs is forwarded to me with a written recommendation of the Criminal Division that I approve it.

"Although 18 U.S.C. 2516(1) permitted me, as Attorney General, to designate an assistant Attorney General to authorize applications for wire interceptions without my approval, I chose not to make such designation, but rather to require that all requests for authority to file such applications be forwarded to me for consideration. This procedure was intended to centralize in me the responsibility for and control of the policies to be followed by the Department of Justice in relation to Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

"All requests received in my office are reviewed by my Executive Assistant, Sol Lindenbaum. Except as otherwise indicated herein, Mr. Lindenbaum transmits the request and all accompanying papers to me, along with his recommendation. If I determine to approve a request, I indicate my approval by initialling a memorandum addressed to the Assistant Attorney General in charge of the Criminal Division. This memorandum recites that the Assistant Attorney General is "specially designated" to authorize the application. Upon receipt of my memorandum, a letter of authorization, over the name of the Assistant Attorney General, is dispatched to the Applicant. The memorandum and the letter of authorization are part of the procedure developed for transmittal of my approval to the applicant. The memorandum constitutes a notification to the Assistant Attorney General of the Criminal Division that I have performed the discretionary act of approving the request.

"Somewhat more than a year after this Department first utilized the provisions of Title III, I verbally [sic— we assume that this means orally] authorized my Executive Assistant to act on my behalf on requests that might be transmitted by the Criminal Division at a time when I was not available to act on them. I gave him this authority in the light of his familiarity with my policies and with my decision on all requests that had been previously submitted to me. My subsequent review of cases in which he approved requests on my behalf confirmed that he followed my policies.

"Since November 20, 1971, I have personally authorized all applications for interception orders which have been presented to Federal judges pursuant to 18 U.S.C. 2516(1)."

A third affidavit is by Sol Lindenbaum. Here is his statement:

"At the times of the acts related in this affidavit I was and am now the Executive Assistant to the Attorney General of the United States. I assist the Attorney General in the review of various matters which require his personal attention such as opinions, interpretations, decisions of the Board of Immigration Appeals, applications for pardons and other forms of Executive clemency, antitrust complaints, contracts, agreements, and proposed offers in compromise. See Title 28, Code of Federal Regulations, Section 0.6.

"The Attorney General has refrained from designating any Assistant Attorney General to authorize, without his approval, the making of an application for an order permitting the interception of wire or oral communications under Title 18, United States Code, Section 2516(1). Rather, the Attorney General has required that all requests for such authorization be referred to him for consideration. In the normal course of my duties, I review such requests and make recom-

mendations to the Attorney General thereon. I have routinely reviewed such requests since February 1969 and, accordingly, have become familiar with the applicable statutory requirements and the actions taken by the Attorney General on such requests.

"On March 19, April 6, April 21, and April 29, 1971, the Criminal Division of the Department of Justice addressed to the Attorney General requests for approval of authorizations to apply for wire interception orders with respect to a certain telephone in San Diego, California, allegedly used by Richard Michael King and others. In each instance, the request was accompanied by copies of the proposed affidavit, application, and order, as well as a recommendation for approval from the Criminal Division. In each instance, I reviewed the submitted material, concluded that the request satisfied the requirements of the statute, and also concluded from my knowledge of the Attorney General's actions on previous cases, that he would approve the requests if submitted to him. Because the Attorney General was not available on any of the four occasions, I approved each of the requests pursuant to the authorization which he had given me to act in the circumstances and caused his initials to be placed on memoranda to Will Wilson. The memoranda approved requests that authorization be given to Charles J. Fanning to make the applications for interception orders.

Copies of these memoranda are attached."

The four memoranda are virtually identical. We quote only the first:

"To: Will Wilson
Assistant Attorney General
 (Initialled) JNM
From: John N. Mitchell
The Attorney General

Subject: *Interception Order Authorization*

This is with regard to your recommendation that authorization be given to Charles J. Fanning of the Criminal Division to make application for an Order under Title 18, United States Code, Section 2518 permitting interception of wire communications for a twenty (20) day period to and from telephone number 714–233–8650 located at 2002 First Avenue, Apartment No. 3, San Diego, California, in connection with the investigation into possible violations of Title 21, United States Code, Section 176a by Richard Michael King and others as yet unknown.

Pursuant to the powers conferred on me by Section 2516 of Title 18, United States Code, you are hereby specially designated to exercise those powers for the purpose of authorizing Charles J. Fanning to make the above-described application."

There is about as much truth in this memorandum as there is in the Wilson letter.

The contrast between the content of the Shapiro, Wilson, Mitchell and Lindenbaum affidavits and the Wilson letter and Mitchell (really Lindenbaum) memoranda is striking, to say the least. The memoranda tell Wilson that he is specially designated under section 2516 to exercise the powers conferred by that section. The affidavits state that no such designation was made, and that Mitchell retained the powers himself, but "verbally" delegated them to Lindenbaum. Yet the Wilson letter recites that he had reviewed the application and made certain determinations, and that Mitchell had specially designated Wilson to exercise his powers under section 2516. We can conceive of no rational explanation for this elaborate paper charade, unless it be to deceive the Congress and the Courts.

Perhaps it would come as no shock to most Americans to learn that government bureaucracies operate in this manner in the handling of their day-to-day affairs. However, this was no ordinary

affair. Title III of the Act prohibits all interception of wire or oral communication "[e]xcept as otherwise specifically provided in this chapter . . . ." 18 U.S.C. § 2511. There are few exceptions; the one relevant to this case is section 2516(1), quoted above.

The Act and its legislative history make clear the purpose of the authorization requirement. Congress was well aware of the grave threat to the privacy of every American that is posed by modern techniques of electronic surveillance. S.Rep.No.1097, *quoted in* 1968 U.S. Code Cong. & Admin.News, 2112, 2154. While recognizing the importance of wire tapping in combating organized crime, *id.* at 2157–60, Congress was concerned lest overzealous law enforcement officers rely excessively upon such techniques in lieu of less intrusive investigative procedures. In order to insure circumspection in their use, Congress erected the elaborate procedural requirements for the initiation of wire taps described above. *See id.* at 2185–96. It was seen as a significant safeguard for the general public that applications for an order to intercept wire or oral communications must be passed upon before they may be presented to a court by "a publicly responsible official subject to the political process"—either the Attorney General or an Assistant Attorney General of the United States. *Id.* at 2185.

 In our opinion, the purpose of this provision was not merely to assure a uniform policy in applying for wire-taps. The Act prescribes a policy: that wire-taps are not to be overused, but are to be confined to those cases of serious crimes in which it is necessary to use them. The Congress wanted each application passed upon by one of the highest law enforcement officials in the government, and it named them. The Congress expected them to exercise judgment, personal judgment, before approving any application. Routine processing by subordinates was not to be the approach. More responsibility than that which devolves upon any department head in any bureaucracy, that is, ultimate responsibility for what his subordinates do, was required. It would subvert the Congressional scheme if we were to sanction anything less than strict compliance with section 2516(1), much less the gross departure that has taken place in this case.

Nonetheless, in an attempt to save its prosecution, the Government argues that the spirit, if not the letter, of the statute has been satisfied here. First, the Government would have us ignore the fact that Will Wilson was ignorant of the letter bearing his name, arguing that the Wilson letter was the "ministerial act" of informing Mr. Fanning that his application had been approved at the Attorney General level.[4] Next, it is argued that it is irrelevant that Attorney General Mitchell did not authorize the wire-tap, because that was done

---

4. A majority of the courts has held that the authorization complies with section 2516(1) if the Attorney General actually approved the request, even though the Wilson letter was false. United States v. Cantor, 3 Cir., 1972, 470 F.2d 890; United States v. Fiorella, 2 Cir., 1972, 468 F.2d 688, 690–91; United States v. Ceraso, 3 Cir., 1972, 467 F.2d 647; United States v. Cox, 8 Cir., 1972, 462 F.2d 1293, 1297–1300; United States v. Becker, 2 Cir., 1972, 461 F.2d 230, 235; United States v. Pisacano, 2 Cir., 1972, 459 F.2d 259, 263; United States v. Askins, D.Md., 1972, 351 F.Supp. 408, [Cr.L.Rep. 2182]; United States v. Fox, S.D.Ill., 1972, 349 F.Supp. 1258, 1261–1262; United States v. Whitaker, E.D. Pa., 1972, 343 F.Supp. 358; United States v. Consiglio, D.Conn., 1972, 342 F.Supp. 556; United States v. Doolittle, M.D.Ga., 1972, 341 F.Supp. 163; United States v. D'Amato, E.D.Pa., 1972, 340 F.Supp. 1020, 1021; United States v. Iannelli, W.D.Pa., 1972, 339 F.Supp. 171, 174; United States v. Acquino, E.D. Mich., 1972, 338 F.Supp. 1080, 1081; United States v. Gerodemos, N.D.Ill., 1972; United States v. LaGorga, W.D. Pa., 1971, 336 F.Supp. 190, 195. *Contra*: United States v. Focarile, D.Md., 1972, 340 F.Supp. 1033, 1051–1060, aff'd sub. nom. United States v. Giordano, 4 Cir., 1972, 469 F.2d 522. We need not take a position on this issue to decide this case, and decline to do so.

by his "alter ego," Sol Lindenbaum, who was intimately familiar with his policies in such matters.[5] The Government characterizes this procedure as a good faith attempt to exceed the requirements of the Act.

For us to accept this position would be to concede that the hand is quicker than the eye. The Government asks us to wave away the fact that no public official appointed by the President and confirmed by the Senate even saw— much less considered or approved—the wire-tap application. It would have us sanction procedures which treat matters affecting the civil liberties of every citizen of this country as an ordinary piece of agency business, despite an express Congressional mandate to the contrary. Needless to say, we will not do so.

Moreover, we note in passing that whoever prepared the Wilson letter and the Mitchell (Lindenbaum) memoranda drew them to track the statute. The letter represents to the judge that Mitchell has delegated to Wilson performance of the duty that the Act imposes, and that Wilson has performed it; the memorandum purports to make the delegation that the Act permits. We cannot describe as "good faith" an apparently deliberate attempt to mislead the court.

Even if we were to deal with the Government's argument on its own terms it could not withstand analysis. Assuming for the sake of argument that the district judge would have issued the wiretap order if he had known that the letter bearing Wilson's name was a fabrication, an assumption that we are not inclined to make, it does not follow that the judge would have accepted approval by Lindenbaum rather than by the Attorney General himself. The Government's alter ego theory proves too much; it cannot be limited to the facts of this case. Rather, its rationale would allow the Attorney General to appoint many alter egos, within the Justice Department or without. This would emasculate the Act. We recognize that the Attorney General cannot always be available to perform the duties imposed upon him by statute. However, Congress anticipated this problem here: The Act permits him to specially designate an Assistant Attorney General to authorize wire-taps; there are nine of them.

A subsidiary argument made by the Government illustrates its vulnerability on this point. It contends that section 2516(1) in fact permits the Attorney General to delegate his authority to approve wire-taps to anyone he pleases, citing the Civil Rights Act of 1968, 18 U.S.C. § 245(a)(1) for the proposition that "when Congress wished to prohibit delegation of any sort, it knew how to do it." While this argument is not necessarily inconsistent with the Government's vigorous assertion that no delegation of authority took place here—the alter ego theory—it certainly grates with it. Moreover, the mere statement of such a position is its own refutation. In Section 2516(1), Congress imposed a personal duty, which is not to be delegated to anyone other than an Assistant Attorney General. The fact that it used different language to achieve the same result in a totally unrelated statute is irrelevant.

■ Both of these arguments are derived in part from United States v. Pisacano, 2 Cir., 1972, 459 F.2d 259 (per Friendly, J.), upon which the Government relies heavily. With all respect to the distinguished judge who wrote that opinion, we are not persuaded by *Pisacano*. As we have indicated, we do not agree that the requirements of section 2516(1) were intended merely to insure the development of a uniform policy with respect to wire-taps or that the At-

---

5. 28 U.S.C. § 503 provides:
 "The President shall appoint, by and with the advice and consent of the Senate, an Attorney General of the United States.
 . . ."

There is no comparable provision for the appointment of an alter ego.

torney General would remain "responsible" by having his name affixed to the authorization. Congress could have attained these objectives in a manner that placed far less responsibility in our highest law enforcement officials; its concern with confining the use of electronic surveillance only to those situations in which it is absolutely necessary convinces us that the authorization requirements are not to be loosely interpreted. We are supported in this conclusion by the fact that almost every other court which has decided the precise question with which we are presented here has held that these procedures violate the Act.[6] Judge Sobeloff exposed the weakness of the "responsibility" argument in United States v. Giordano, *supra*, note 4, stating:

"If we should accept the Government's reasoning, there can be no assurance that in some future case, if the particular wiretap authorization proved politically embarrassing, the Attorney General would not then repudiate his "Lindenbaum." The Attorney General would always be able to say with the benefit of hindsight that the subordinate had betrayed his confidence, acted beyond the scope of his responsibility, and the actions taken were not those of an agent. The alter ego theory destroys the concept of establishing identifiable individual responsibility at a certain level of government." 469 F.2d at 528.

▮ Finally, the Government argues that even if the tap of King's telephone was improperly authorized, there is no reason to apply the "drastic remedy of suppression to correct a technical defect in procedure which in no way undercuts

the purpose of the statute or infringes on the rights of the individuals involved." This has been described as a "beautiful example of the bootstrap technique." United States v. Giordano, *supra*, note 4. We agree. The argument fails because we have rejected its underlying premise. The authorization requirements provided for in section 2516(1) are not mere technicalities; they are at the heart of the Congressional scheme. Moreover, as we have emphasized above, we are not concerned just with the rights of these defendants. The Act's procedures were designed to protect the general public from abuse of the awesome power of electronic surveillance. The communications in this case were unlawfully intercepted; Congress has provided that the evidence derived therefrom must be suppressed. 18 U.S. C. § 2515.

It is with great reluctance that we reverse the convictions in this case. The evidence of guilt derived from the wiretap is overwhelming. A thorough and expensive investigation extending over a period of some months is in effect washed down the drain (except for the contraband that was seized), and it is quite clear that neither Mr. Fanning nor the officers in the field had any means of knowing that the applications were improperly authorized. They, too, were "had."

However, the blame for this waste of public resources does not rest with this court; it lies squarely in the Office of the Attorney General of the United States. Congress did not mean to hamstring law enforcement when it enacted Title III. Rather, it believed that the technology available to organized

---

6. United States v. Giordano, *supra;* United States v. Robinson, 5 Cir., 1972, 468 F.2d 189, vacated and remanded in banc, 1973, 472 F.2d 973 [January 16, 1973]; United States v. Wierzbicki, E.D.Mich., 1972, 12 Cr.L.Rep. 2075; United States v. Fox, *supra;* United States v. Vasquez, C.D. Cal., 1972, 348 F.Supp. 532; United States v. Narducci, E.D.Pa., 1972, 341 F.Supp. 1107; United States v. LaGorga, W.D.Pa., 1972, 340 F.Supp. 1397; United States v. Baldassari, M.D.Pa., 1972, 338 F.Supp. 904; United States v. Acquino, *supra;* United States v. Cihal, W.D.Pa., 1972, 336 F.Supp. 261; United States v. Montello, D.D.C., 1972. Furthermore, the panels in *Becker* and *Fiorella, supra,* implied that they had misgivings about the result in *Pisacano, supra,* although bound by it as the law of the Second Circuit. *See* 468 F.2d at 691; 461 F.2d at 233–234.

crime made properly supervised electronic surveillance essential. But proper supervision is the key. For some reason unknown to this court, the highest law enforcement official in this country felt that he could ignore an express command of Congress. Needless to say, he cannot.

Concern for the evils of crime is increasing in the United States, and not without justification. However, in such times it is especially important that the law not be bent in the name of expediency, especially not by the highest law enforcement official in the land. The words of Justice Brandeis, written over forty years ago, sound a warning which must be repeated:

"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

Olmstead v. United States, 1928, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L. Ed. 944 (Brandeis, J., dissenting).

## II. *Standing.*

While conceding the standing of the other defendants, the Government argues that defendants Maack, Light, and Virginia Pope cannot challenge the legality of the wire-tap.

Under the Act, only "aggrieved persons" as defined in section 2510(11) may move to suppress evidence obtained through electronic surveillance. 18 U.S. C. § 2518(10)(a). Both the language of the statute and its legislative history make it clear that it does not broaden the rule of standing provided for in Rule 41(e), F.R.Crim.P., relating to Fourth Amendment motions to suppress. 18 U. S.C. § 2510(11); S.Rep.No.1097, 90th Cong.2d Sess., *supra*, at 2179. *See also* Alderman v. United States, 1969, 394 U. S. 165, 175 n. 9, 89 S.Ct. 961, 22 L.Ed.2d 176. Thus, a defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises. Alderman v. United States, *supra*, 394 U.S. at 176, 89 S.Ct. 961.

Applying this standard, we hold that defendant Maack has standing to challenge the wire-tap. On at least one occasion a message sent at his direction and a reply thereto were intercepted by Government agents. His privacy was thus invaded to the same extent as if he had taken the phone in hand and spoken on the line himself.

However, it is conceded that neither Light nor Virginia Pope has standing. Rather, they argue that the Government waived this objection by not raising it in the proceedings below. While the rule that constitutional rights are personal and may not be raised by a third party is not required by the Constitution, *see* Barrows v. Jackson, 1953, 346 U.S. 249, 255–260, 73 S.Ct. 1031, 97 L.Ed. 1586, and it conceivably may be possible to waive it, no such waiver occurred here. The government orally challenged the standing of Light and Virginia Pope to participate in the hearing on the motions to suppress wire-tap evidence. This was sufficient to preserve the matter for appeal. See Rule 51, F.R.Crim.P.

Next, it is contended that the convictions of Light and Virginia Pope

should nonetheless be reversed because they abandoned their motions for severance in reliance upon the district court's permitting them to participate in the suppression motions. This argument is frivolous. No wire-tap evidence was introduced against them at the joint trial which could not have been introduced at a separate trial. Thus, they suffered no prejudice.[7]

Having concluded that defendants Light and Virginia Pope lack standing to object to the tap of King's telephone, we consider their other contentions on this appeal.

### III. *Convictions of Light and Virginia Pope.*

#### A. *Transcription of Grand Jury Minutes.*

■ First, it is argued that the indictments against Light and Virginia Pope should be dismissed for the Government's refusal to transcribe proceedings before the grand jury. Following the return of the original indictments in this case, the defendants made a timely motion before a United States Magistrate for the transcription and disclosure of future grand jury testimony. The motion was denied, but the Magistrate warned the United States Attorney that failure to do so, if shown to be prejudicial, could result in dismissal. Nonetheless, two days later the Government obtained a superseding indictment with no court reporter present.

■ The district judge described this action as "imprudent." We consider it "arrogant" as well. There is a growing awareness that grand jury secrecy is not an end in itself, and the reasons underlying this tradition are undergoing judicial scrutiny. *See, e. g.,* Dennis v. United States, 1965, 384 U.S. 855, 869–872, 86 S.Ct. 1840, 16 L.Ed.2d 973; Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 401–410, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (dissent-

ing opinion of Brennan, J.); United States v. Dinsio, 9 Cir., 1972, 468 F.2d 1392, 1394; Bursey v. United States, 9 Cir., 1972, 466 F.2d 1059, 1077, 1091–1092; Loux v. United States, 9 Cir., 1968, 389 F.2d 911, 916 n. 2. As the Government correctly points out, the rule in this Circuit is that the recording of grand jury testimony is permissive rather than mandatory; however, we have also observed that such permission may not be arbitrarily denied. United States v. Thoresen, 9 Cir., 1970, 428 F. 2d 654, 666. It becomes increasingly apparent that these warnings will not be taken to heart until we actually dismiss an indictment.

The only complete remedy for the Government's behavior would be to dismiss the indictment and require the Government to start over, before a new grand jury, with a reporter present to record the testimony of the witnesses. That, however, is a drastic remedy, and, as in *Thoresen, supra,* we are not willing to use it here. That is not because we approve of the Government's action; far from it.

■ There are two steps that must be taken if defendants are to have the benefit of their right to inspect grand jury testimony under Dennis v. United States, *supra.* The first step is the recording of the testimony. That, however, without more, does not give defendants the right to inspect the record. They must also show a particular need.

We recognize that the Government's refusal to record grand jury proceedings may make it difficult for a defendant to make the showing of need necessary to compel disclosure. But here Light and Virginia Pope have not even attempted such a showing. *Compare* Dennis v. United States, *supra,* 384 U.S. at 871–873, 86 S.Ct. 1840; Osborne v. United States, 9 Cir., 1967, 371 F.2d 913, 917–919. They obtained discovery of the Government's wire tap evidence, which

---

7. Light and Virginia Pope also urge us to adopt the position of Justice Fortas, who dissented in *Alderman,* under which they might have standing to challenge the wiretap. This argument is addressed to the wrong court.

was the crux of its case against them. In such circumstances, they suffered no sufficient prejudice from denial of their motion to record the proceedings to warrant action by us in this case. United States v. Fishbein, 9 Cir., 1971, 446 F.2d 1201, 1206; United States v. Thoresen, *supra.*

■ We repeat our previous warnings, however: the Government is courting disaster when it fails to record grand jury proceedings, and the judges should exercise their discretion to require such recording. We reserve the matter of the remedy for a more appropriate case. *Cf. Thoresen, supra,* 428 F.2d at 666.

### B. *Disclosure of the Informant*

■ Light and Virginia Pope's second argument is that it was error for the district court to deny disclosure of the identity of the informant whose information was the primary basis for authorization of the wire-tap. This argument is without merit.

■ There is no constitutional requirement that the identity of an informant be disclosed in a probable cause hearing. McCray v. Illinois, 1967, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62. Whether such a requirement will ultimately be imposed as a rule of practice in federal courts is not clear, *but see* United States v. Harris, 1971, 403 U.S. 573, 585, 91 S.Ct. 2075, 29 L.Ed.2d 723 (plurality opinion of Burger, C. J.); however, the rule in this Circuit is that the informant need not be disclosed when the sole issue is probable cause. United States v. Mehicz, 9 Cir., 1971, 437 F.2d 145, 148–149, cert. denied 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139; Lannom v. United States, 9 Cir., 1967, 381 F.2d 858, 861.

■ Moreover, even if we were to accept the defendants argument that the standard of Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed. 2d 639, which held that the identity of an informant must be disclosed whenever it is relevant or helpful to the trial defense of an accused, applies to probable cause hearings, it would not benefit them here. Their argument is that the informant gave false information, not that the officer did not have reason to believe that what he was told was true. Such an attack is not permitted in a hearing to determine probable cause, and the informant's identity would therefore not have been relevant. United States v. Perry, 2 Cir., 1967, 380 F.2d 356, 358, cert. denied 389 U.S. 943, 88 S.Ct. 307, 19 L.Ed.2d 299. *See also* Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv.L.Rev. 825, 832–33 (1971).

Here there was uncontradicted testimony that the informant purported to have personally observed the events in question, that he had given information to police officers over a long period of time, and that such information had always proved accurate. It was not error for the district court to withhold his identity. United States v. Mehicz, *supra.*

### C. *Whether the marijuana was properly admitted.*

■ Finally, Light and Virginia Pope argue that the district court erred in admitting into evidence the marijuana siezed from their vessel, because goods are not considered smuggled until they have reached a customs house and a negative declaration has been made.

The short answer to this contention is that the defendants were charged with and convicted of conspiracy to smuggle marijuana into the United States. It is irrelevant whether or not the substantive offense was consummated. *See* United States v. Rabinowitch, 1915, 238 U.S. 78, 85–86, 35 S.Ct. 682, 59 L.Ed. 1211. The marijuana was properly admitted as evidence relating to an overt act in furtherance of the conspiracy.

In Nos. 72–1602 and 72–1597, the respective convictions of defendants Light and Virginia Pope are affirmed.

In all of the other cases, the judgments are reversed and the cases are remanded to the district court.

JAMESON, District Judge (concurring in part and dissenting in part):

I concur in Section II (Standing) and Section III (Convictions of Light and Virginia Pope) of the court's opinion, but respectfully dissent from the holding in Section I that the wiretap was invalid.

As noted in the court's opinion, the Court of Appeals for the Second Circuit in United States v. Pisacano, 459 F.2d 259 (1972), was concerned with the validity of wiretaps where the procedure in obtaining the court order was essentially the same as that followed in this case. The court, in an opinion by Judge Friendly, held that the use of wiretaps resulting from the court order did not warrant reversal of the conviction. As a member of the panel in *Pisacano* I concurred in Judge Friendly's opinion and adhere to the views therein expressed.

In *Pisacano* the appellants relied upon the decision of the Fifth Circuit in United States v. Robinson, 468 F.2d 189, where the opinion had been filed on January 12, 1972.[1] Apparently *Robinson* was the first of many cases in which the procedures followed by the Department of Justice in electronic surveillance have been challenged.[2] In *Robinson* the court reversed a conviction based upon wiretap procedures similar to those in *Pisacano* and the instant cases and remanded to the district court with directions to dismiss the indictment. Subsequent to the decision in *Pisacano* and other cases involving the validity of interception orders, *Robinson* was reheard by the court en banc after the United States had filed a supplemental appendix containing additional affidavits and exhibits.

On January 16, 1973 in a per curiam opinion *Robinson* was remanded "to the district court for an expedited evidentiary hearing to determine whether the wiretap applications * * * were properly authorized under 18 U.S.C.A. 2516(1)", the district court to "make findings of fact and conclusions of law" to be transmitted to the appellate court. (472 F.2d at 974.) Nine members of the court joined in the order. Six, including the three members of the initial panel, dissented, urging "that the original and supplemental affidavits present all of the evidence relevant to the proper interpretation of the Department's action vis-a-vis Congress' § 2516(1) intent as to how wiretap authorizations should be initiated" and "that conceding all that is sworn to, compliance with the statute is still wanting under the panel view." (472 F.2d at 976)

The majority opinion noted that, "The unusual importance of the issue is underscored by the number of courts that have dealt with it since publication of the panel decision." (472 F.2d at 974) Both opinions cite cases which have followed the panel decision in *Robinson* or otherwise resolved the authorization issue against the Government and other cases which have held contrary to *Robinson* (including *Pisacano*) or distinguished the authorization procedures from those followed in *Robinson*.[3]

---

1. The appeal from the decision of the district court, United States v. Escandar, 319 F.Supp. 295, (S.D.Fla.1970) "was intended to raise the constitutionality of Title III of the Omnibus Crime Control and Safe Streets Act of 1968", but "with the development of facts unknown until the case was before" the appellate court, it turned out "to present only the question of who may initiate an application to engage in * * * secret electronic surveillance under the authorization proviso of that legislation." 468 F.2d at 190.

2. After the procedures had been challenged in *Robinson* and beginning November 20, 1971 the Attorney General "personally authorized all applications for interception orders * * * presented to Federal judges pursuant to 18 U.S.C. 2516(1)." Aff. of John N. Mitchell quoted in majority opinion.

3. The dissenting opinion noted that four other circuits and at least 13 district courts had delivered opinions dealing with the authorization procedures of the Department of Justice; that 13 additional

There are no substantive differences in the content of the affidavits set out in the majority opinion and those appended to the dissenting opinion in *Robinson*. The same procedures were followed. Here, however, the affidavits and procedures were considered by the district court in ruling on a motion to suppress on the ground of newly discovered evidence filed subsequent to the guilty verdicts and prior to imposition of sentence.[4] Following a hearing the motion to suppress the wiretap evidence was denied, without formal findings or opinion.[5]

The records in *Robinson, Pisacano* and the instant cases all contain affidavits of Sol Lindenbaum, Executive Assistant to the Attorney General. In addition the record here contains an affidavit of John N. Mitchell, Attorney General, quoted in full in the court's opinion. This affidavit confirms and clarifies the policy of the Attorney General set out in the other affidavits.

While 18 U.S.C. § 2516(1) permitted the Attorney General to specially designate any Assistant Attorney General to authorize applications for wire interceptions without his approval, the Attorney General "chose not to make such designation, but rather to require that all requests for authority to file such applications be forwarded to (him) for consideration." This was intended to centralize in the Attorney General "responsibility for and control of the policies to be followed by the Department of Justice in relation to Title III. . . . ."

All requests for authorization to apply for wire interception orders were "subject to intensive review in the Criminal Division of the Department of Justice" and forwarded to the Attorney General with a written recommendation of the Division for approval. All requests were then reviewed by Sol Lindenbaum, Executive Assistant, and transmitted to the Attorney General with his recommendation.

"Somewhat more than a year" after the Department first utilized the provisions of Title III, the Attorney General "authorized (his) Executive Assistant to act on (his) behalf on requests that might be transmitted at a time when (he) was not available to act on them." The affidavit continues: "I gave him this authority in the light of his familiarity with my policies and with my decision on all requests that had been previously submitted to me. My subsequent review of cases in which he approved requests on my behalf confirmed that he followed my policies."

As the court said in *Pisacano*:

"The Attorney General assumed full responsibility for what was done even if he did not act himself in every case. From what now appears, the 'narrow limitation' on authorizations by 'top department officials' prescribed in § 2516(1) did result in the establishment of 'a unitary policy in the use of the awesome power conferred' in Title III—as the *Robinson* court concluded was the intent of Congress. Indeed, that court remarked that a direct authorization by the Executive Assistant 'would have assured that the application was deemed warranted in this particular case and was not "routinely" made by the Assistant Attorney General's deputy, "in conformity with

---

unreported decisions of district courts were pending appeal in six circuits; and that the Department of Justice had informed the court that 92 cases were pending in 29 different district courts in which the issue of the authorization of wiretap applications had been raised. (472 F.2d at 975–976, note 1)

4. While the misstatements in the authorization applications first came to light after convictions in all of these cases, in

*Pisacano* (following pleas of guilty) and *King et al.* (following jury verdicts in jury trials or findings of guilt by the court) the procedures were questioned in the district court. In *Robinson* the issue was first raised in the appellate court.

5. Other motions relating to the wiretap surveillance had been considered by the district court in a written opinion prior to trial. 335 F.Supp. 523 (S.D.Cal.1971)

the standard procedure." ' Moreover, the procedures used clearly conformed with the letter of § 2516(1), particularly when this is read in light of the evidence, furnished by § 101(a) of the Civil Rights Act of 1968, 18 U.S.C. § 245(a)(1), that when Congress wished to prohibit delegation of any sort, it knew how to do it." 459 F.2d at 263.

As stated in the court's opinion, "The evidence of guilt derived from the wiretap is overwhelming." I agree that this in itself is not sufficient to sustain a conviction. It does, however, reenforce my reluctance to join in the opinion, in view of the fact that the Attorney General personally assumed full responsibility for what was done and there is no suggestion that the papers accompanying the request to the Executive Assistant were not sufficient to warrant the application for the interception order.[6]

A close and difficult problem is presented. Certainly plausible reasons have been advanced for both interpretations of the provisions of § 2516(1).[7] In view of the clear conflict in the circuits, it is obvious that the issues will be resolved ultimately by the Supreme Court. A petition for certiorari in United States v. Pisacano was filed on April 28, 1972 and a petition in the subsequent Second Circuit case of United States v. Becker, 461 F.2d 230, was filed on July 28, 1972. There has been no ruling on either petition. While I would prefer to await the decision of the Supreme Court on the pending petitions, in the absence of such a ruling I adhere to *Pisacano* for the reasons stated therein.[8]

I would affirm all of the convictions.

6. Even though the application to the district judge misstated the authorization procedure, as noted *supra*, a second district judge who tried the case, after being fully apprised of the procedure actually followed, denied the motion to suppress the wiretap evidence.

7. Senate Report No. 1097, referred to in opinions supporting both interpretations, contains this paragraph:

"Paragraph (1) [18 U.S.C. § 2516] provides that the Attorney General, or any Assistant Attorney General of the Department of Justice specifically designated by him, may authorize an application for an order authorizing the interception of wire or oral communications. This provision centralizes in a publicly responsible official subject to the political process the formulation of law enforcement policy on the use of electronic surveillance techniques. Centralization will avoid the possibility that divergent practices might develop. Should abuses occur, the lines of responsibility lead to an identifiable person. This provision in itself should go a long way toward guaranteeing that no abuses will happen." 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2185

The procedures adopted by Attorney General Mitchell did centralize the formulation of policy "in a publicly responsible official subject to the political process"; that centralization did avoid the development of "divergent practices"; and the procedures now discovered have led to "an identifiable person."

8. In United States v. Becker, *supra*, 461 F.2d at 236, the court stated that an adherence to the law as set forth in *Pisacano* should "not be construed as an approval of the procedure followed by the Attorney General and his staff * * *." The same is true here. Even though I find no evidence of bad faith or reliance upon insufficient evidence in seeking the interception orders, I do agree that it is unfortunate that the Department of Justice did not comply more strictly with the statutory provisions. As stated in Mr. Mitchell's affidavit, the procedure has been discontinued and all applications since November 20, 1971 have been approved personally by the Attorney General.