**Robert Craig LIGHT,**
**Petitioner-Appellant,**

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

No. 74–3204.

United States Court of Appeals,
Ninth Circuit.

Jan. 21, 1976.

Michael S. Hegner, El Cajon, Cal., for petitioner-appellant.

Harry D. Steward, U. S. Atty., San Diego, Cal., for respondent-appellee.

OPINION

Before MERRILL, CHOY and GOODWIN, Circuit Judges.

MERRILL, Circuit Judge:

In *United States v. King*, 478 F.2d 494 (9th Cir. 1973), this court held that certain telephone taps had been conducted in violation of law and that the conversations overheard were inadmissible as to those whose privacy had been invaded. Standing to suppress, however, was not extended to all defendants. We stated: "[A] defendant may move to suppress the fruits of a wire-tap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises * * *." 478 F.2d at 506. Standing was, however, extended to one Maack who was not party to a conversation. As to him, we stated: "On at least one occasion a message sent at his direction and a reply thereto were intercepted by Government agents. His privacy was thus invaded to the same extent as if he had taken the phone in hand and spoken on the line himself." *Id.*

Robert Craig Light, appellant here, was a party to *United States v. King* who, not having participated in any conversation, was held not to have standing to suppress the overheard conversations. Judgment against him was affirmed.

Subsequently, Light sought to show that two of the conversations overheard had had reference to him. He contended that he should have been granted standing for the same reason that standing had been granted to Maack; that he had in substance sent a message and received an answer. Light has unsuccessfully sought review of the question of standing by means including motion for new trial on the ground of newly discovered evidence (denied), and petition for relief

under 28 U.S.C. § 2255 (denied without hearing). This appeal is taken from denial of his petition under § 2255. Questions are presented as to his right to press his claims under that section. These we need not reach. Assuming arguendo that he could, we conclude that the Maack rule would not apply on the facts here.

The conversations to which Light refers in relevant part are set forth in the margin.[1] In conversation 22, James Olson, in charge of one of the ships engaged in the criminal enterprise, is talking to King, the principal conspirator. He says that a young couple wanted to "charter" the boat; that they had lost out on their own charter when their boat was involved in an accident; that "Bill" was very insistent on it (from the conversation had the next morning we learn that the couple had been helpful to Bill and that he felt indebted to them); that Olson felt that taking the couple on would not interfere with the "other charter" and that they looked okay to him but that he had said he would have to have King's approval. King tells Olson to get in touch with him the next morning.

In the next recorded conversation, King says that he had gotten in touch with Bill about the other "charter party"; that he will leave it to Olson as he is the one who will have to put up with them. Olson expresses pleasure, "[I]f it pleases Bill * * * that's fine because * * * he's doin' a good job."

■ Light asserts that he was one of the persons to whom Olson referred as the "charter party." He contends that an evidentiary hearing would have es-

---

1. Conversation No. 22, 4–10–71, 3:21 p. m.

\* \* \* \* \* \*

Olson: I guess, ah, Bill talked to you, maybe he mentioned da that there's some, ah, people that wanted, ah, to, ah, charter the boat and, ah, I didn't know what to say, ah, it—it appears okay. Ah, it won't interfere with our-r-r-r other charter. Ah, in fact, it doesn't amount to hardly anything but, ah, he's very insistent about it. Ah, I said that I would have to ask you first. Ah, over.

King: Well, I would like you to use, I actually haven't heard from him yet. Ah, I plan to hear from him at six tonight. When does this charter take place?

Olson: Ah, well, they said, ah, anything that would coincide with our, ah, schedule and, ah, ah, they're well, you know, they missed out on their charter. They had it all arranged and, ah, ah, they, the ah, vessel had an accident, so ah, they have to go back to work shortly so they were kinda hopin' that we would have time to fit em in. And, ah, I, it looks okay to me, but, ah, I said I couldn't do it unless you said all right.

King: Well, ah, I tell you what, ah, would it be possible ah, for you to get in touch with me again, ah, say sometime around ah, oh, eight or nine in the morning. Would that be possible?

Olson: Ah, that is, ah, your time; I will try.

King: Okay, ah, I'll speak to him in the meantime and find out, ah, ah, just what his arrangements are.

\* \* \* \* \* \*

Conversation No. 23, 4–11–71, 8:30 a. m.

\* \* \* \* \* \*

King: I spoke to ah, ah, to Bill about that other charter party. He said that, ah, it was just a small group, huh?

Olson: Oh, yes, ah, as far as ah, ah, financial gain, ah, they're ah, I'm afraid they—they don't have much to offer, but they're very nice people. Just a young couple and, ah, they make good footage for the movie.

King: Well, ah, he seemed to, ah, indicate to me that, ah, they were a lot of help to you at one time.

Olson: Oh, ah, say if there's any way that I can get the word to Bill, ah, I would like to really tell him that he certainly has a fantastic crew. When it comes to ah, ah, ah, the action part of the film, ah, they—they really got it, got it together and, ah, I'm really impressed.

King: Good, well, ah, these kids that want to go chartering, ah, ah, ah, Bill tells me that, ah that they were helpful at one time. Ah, is that right?

Olson: Ah, yes, ah, well, that's his business, of course. Ah, he owed them, ah, somethin' for that.

King: Uh-huh. Well, ah, supposing, ah, I just leave it in your hands. It sounds good to me. If you think they're the kind of people who will ah, pay their bills and ah, and ah, won't cause any trouble with the rest of the charter ah, you go right ahead, Jim ah, because you're the one who, ah, has to put up with em so what—whatever you think. If they look like they're nice folks to you, why go right ahead.

Olson: Ah, okay, ah, I'll let that, ah, ride for now. Ah, but, if it's like you said, ah, it doesn't matter and ah, if it pleases Bill, ah that's fine because ah, he's doin' a good job.

tablished that fact and that Olson's conversation with King was instigated by him. In our judgment these conversations on their face show that they cannot serve to bring Light within application of the Maack rule.

 The question, under *United States v. King, supra,* is whether Light's privacy was invaded; that is, whether he was a participant in an intercepted conversation, directly, or through the sending of a message. We hold he was not. He was not himself speaking to King through Olson. He was simply the subject of the conversation. He had sought action from Olson for which Olson needed authority and it was to ascertain whether or not that authority would be forthcoming that the call was made. A business call with reference to the needs of a customer is not a message from the customer in the sense of the Maack rule. Even if the call was made at Light's instance, Olson was speaking on behalf of himself. It was his privacy (and King's) that was invaded.

Affirmed.