UNITED STATES of America

v.

Pasquale FALCONE et al., Defendants.

Crim. No. 77-73.

United States District Court,
D. New Jersey.

Sept. 28, 1973.

Richard D. Gregorie, S. A. A. G., Donald F. McCaffrey, S. A. A. G., Newark, N. J., for the Government.

Kenneth J. McGuire, Newark, N. J., for defendant Falcone.

Mortimer Todel, New York City, for defendant Dasti.

John Nicholas Iannuzzi, New York City, for defendant Venduras.

Paul Alongi, Bloomfield, N. J., for defendant F. Berger.

Graham Roskein, Newark, N. J., for defendant W. Berger.

Anthony T. Colasanti, Newark, N. J., for defendant Terrigno.

## OPINION

LACEY, District Judge:

This proceeding and the facts adduced therein underscore the problems inherent in both administrative attainment and judicial determination of compliance with the "minimization" provision of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970).

On August 28, 1972, this Court, under the authority of 18 U.S.C. § 2518 (1970), signed an order authorizing Special Agents of the Bureau of Narcotics and Dangerous Drugs (BNDD) to conduct electronic surveillance on the telephone subscribed to in the name of Pasquale Falcone, located at 201 Cross Street, Apartment 9H, Fort Lee, New Jersey. The purpose of the surveillance, as stated in the above Order, was the revelation of the manner in which the subject and others, then unknown:

> participate[d] in the distribution, dispensing, and possessing with intent to distribute and dispense, a controlled substance, to wit, heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 812 and a conspiracy in violation of Title 21, United States Code, Section 846, and which reveal the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of twenty

(20) days from the date of this Order, whichever is earlier.

By the above Order, this Court required said agents to submit detailed reports of the surveillance activities on the fifth, tenth, and fifteenth days thereafter. In lieu of a final report, the Government submitted an application for extension of the initial Order [18 U.S.C. § 2518(5)] for an additional 20 days and attached thereto affidavits outlining the development of its surveillance to that point, and the reasons in support of the application for further surveillance. This extension, and, thereafter, one other similar extension, were granted, each followed by the usual five-day reports. Both the original Order and the two extensions, dated respectively September 15, 1972, and October 4, 1972, expressly required minimization pursuant to the requirement of 18 U.S.C. § 2518(5) that "[e]very order . . . shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ." [1]

Defendants were indicted and subsequently moved to suppress evidence obtained during the surveillance on the ground that the Government failed to comply with the Order to minimize conversations intercepted. This Court held an extensive hearing on the motion, covering some 2,000 pages of transcript, over twelve days.

During the pre-trial period the Government advised defendants it intended to offer at trial certain intercepted telephone conversations recorded under a Title III Order obtained in another district in another proceeding. In this connection it appears that on November 30, 1972, the Honorable John Morgan Davis, United States District Judge for the Eastern District of Pennsylvania, signed a Title III Order authorizing an elec-

---

I. The Order provided that the surveillance: . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interceptions under Chapter 119 of Title 18, United States Code . . . .

tronic surveillance on the telephone subscribed to in the name of Michael De Vito located at 904 Christian Street, Philadelphia, Pennsylvania, bearing telephone number (215) 923–3162. Judge Davis subsequently signed on December 15, 1972, an Order for a continuation of this electronic surveillance. Pursuant to Judge Davis' Orders, Special Attorney Stephen Stein of the Justice Department Strike Force in the Philadelphia office, filed written five-day reports on the progress of the electronic surveillance on the fifth and tenth day of each 15-day electronic surveillance period. The electronic surveillance terminated on December 16, 1972 (12 days before the end of the second 15-day surveillance period), and the actual listening and recording devices were shut off permanently on December 18, 1972.

Defendants' motions are directed to the Philadelphia electronic surveillance procedures and materials as well as the surveillance authorized by my Orders.

Testifying in the proceedings before me were Special Attorney Richard Gregorie (Gregorie) of the Justice Department Strike Force in Newark; Special Agent Michael Campbell (Campbell) of what was formerly the Bureau of Narcotics and Dangerous Drugs (BNDD) and is now the Drug Enforcement Administration (DEA), who was the agent in charge of the monitoring conducted pursuant to my Orders and whose affidavits provided the bases for the Government's Title III applications; the aforesaid Special Attorney Stein (Stein); Special Agent Vincent Di Stefano (Di Stefano), who performed as did Campbell, but on the monitoring conducted pursuant to Judge Davis' Orders; James P. Hunt (Hunt), Assistant Regional Administrator in New York of BNDD in 1972, who today bears the same title in DEA; Special Agent In Charge Marion Hambrick (Hambrick), Campbell's immediate superior, who in turn reported to Hunt; and Special Agent Joseph Feaser (Feaser), who was a monitoring agent under Campbell.

My findings of fact and conclusions of law are hereinafter set forth.

As to the New Jersey surveillance:

During the period of the electronic surveillance, August 28, 1972, to October 16, 1972 (50 days), two agents were present at all times and monitored telephone conversations to and from (201) 461–9164 pursuant to my Orders. They would record the conversation on two Uher recorders and obtain the time of the calls, the duration of the calls and the telephone number dialed from a pen register, reflecting such data in log sheets, one sheet per call. The recorders, the pen register and the listening device would be shut off from time to time, as will hereinafter be discussed, in response to my directive to minimize the interceptions, as the monitoring agents recognized calls to be privileged or not pertinent to the investigation as framed in my Orders. The electronic surveillance was terminated on October 16, 1972, nine days before the end of the twenty-day period set out in the second wiretap extension Order.

On August 30 or September 1, 1972, Campbell was at the monitoring site. He placed a card on the recorder with instructions to the monitoring agents not to intercept "Tony's wife Helen" or "Pat's wife Edith" and, on September 3, 1972, placed two large charts on the wall of the intercept site instructing the monitoring agents how to conduct the intercept, on what were considered privileged conversations, and who was not to be intercepted. Campbell thereafter on September 12, 1972, made, or instructed a senior agent to make, an addition to both the card placed on the recorder and the charts on the wall adding the name of Janice Mende to the list of people not to be intercepted. Campbell kept a file of the numbers called from the intercepted telephone in order to make a determination from time to time as to whether an individual called from the Falcone telephone was or was not involved in the conspiracy, the better to evaluate whether, or to what extent, a call should be intercepted. Campbell

visited the intercept site at least twice a day, covering at least two of the shifts, and gave oral instructions to the monitoring agents which those agents were to pass on to the next shift of agents. Campbell's instructions would be modified according to the status of the investigation. Thus, from time to time he revised his instructions as to calls between Del Vecchio (Tony) and Janice Mende (Janice). At various times during the intercept, Agent Campbell made the determination that certain people, once identified, should not be intercepted. Instructions as to these people were modified from time to time as the investigation continued, and Gregorie daily discussed the investigation, the surveillance, and the instructions concerning the monitoring. The agents were instructed how to use the equipment and, I find with only a few understandable lapses, faithfully noted each call, when the call initiated, how long it lasted and how many feet of tape were recorded.

Campbell, during his eight days of testimony, detailed his efforts and the efforts of the other monitoring agents, to comply with minimization provisions of the statute and of my Orders. He earnestly and candidly addressed himself to the rare mechanical failures of the equipment, and the lapses of the men who monitored the attempted 2,100 calls for fifty consecutive days. Under skilled and severe cross examination, confronted by defense counsel with carefully selected conversations, he readily conceded that on occasion monitoring agents had not properly minimized a call. Overall, his testimony reflects a good faith effort on the part of the agents to minimize non-pertinent and privileged conversations.

I turn next to an analysis of the calls. Both the Government and defense counsel have submitted in either exhibit form, or as schedules to their post-hearing briefs, their self-serving concepts of how the hundreds of calls should be reviewed in order to decide if minimization was achieved. Before addressing myself to this aspect, I note the wise caution of Judge Pollock in United States v. Bynum, 360 F.Supp. 400, 415 (S.D.N.Y.1973):[2]

> In analyzing the investigation conducted herein, the parties have prepared various statistical analyses relating to the content of intercepted calls. Such analyses must be received with caution. See United States v. Focarile, 340 F.Supp. 1033, 1049 (D. Md.), aff'd sub nom. United States v. Giordano, 469 F.2d 522 (4th Cir. 1972); United States v. King, 335 F. Supp. 523, 542 (S.D.Cal.1971), rev'd., 478 F.2d 494 (9th Cir. 1973) (*on other grounds*). While statistical correlations may provide guidance on the question of minimization, such calculations can be misleading and, if so, should not be accepted as conclusive on that question. *Id.* Mathematical manipulations prepared for the purpose of the instant review are necessarily grounded on retrospective and self-interested analysis by lawyers or agents, who have utilized the benefits of time and hindsight. The emphasis in deciding minimization must be on the perspective of the inspectors as of the time of the surveillance. Informed second guessing of the inspectors, even bolstered by percentages, should not cloud that perspective. The inquiry should not be reduced to a game of numbers, played out in a vacuum, and sealed off from its real consequences.

A total of approximately 2,100 attempted telephone calls were intercepted on Falcone's telephone during the fifty days under my Orders. Of these, ap-

---

2. Following trial in this matter which had resulted in convictions of the defendants, the United States Court of Appeals had remanded the case for an evidentiary hearing to determine whether said wiretap evidence used at trial had been legally obtained. 475 F.2d 832 (2d Cir. 1973). Judge Pollack's opinion referred to was rendered following the evidentiary hearing. Judge Pollack was affirmed in all respects by the Court of Appeals on September 24, 1973, United States v. Bynum, 485 F.2d 490 (2d Cir. 1973).

proximately 900 were busy, misdialed, not answered or were otherwise not completed. Of the approximate 1,200 calls which were completed, the Government concedes that 145 or 12.2 percent were between people not known to be co-conspirators. The Government also concedes that 75 calls or 6.3 percent were to the New Jersey Bell Telephone Company.[3] I find that these calls were pertinent to the investigation in that they permitted the monitoring agents to find out if telephone service might be discontinued, thereby ending the electronic surveillance without the agents' knowledge. Nine calls were made to travel agencies and airlines. This information was essential to determine where, how, and when the alleged co-conspirators might be traveling in what the Government's investigation indicated might well be an international heroin smuggling ring. Seven calls were made to the State Bank of Fort Lee. Money was needed to purchase narcotics and therefore conversations relating to obtaining money would be pertinent to the investigation. One hundred and sixty-three calls or 13.5 percent of the total completed calls were to or from individuals who were not identified. Since one of the purposes of the interception was to identify any co-conspirators of Falcone, Dasti, et al., these interceptions were necessary. One hundred and thirty-three calls or 12 percent of the total completed calls were made to or from individuals who were, I find, suspected of being co-conspirators.

Of the remaining calls, there were 73 calls made to or from Donna Frystock, a female friend or associate of Pasquale Falcone, who lived in an apartment rented by Falcone, used a telephone subscribed to by Falcone, and was reasonably thought to be a possible co-conspirator or unwitting tool in this narcotics conspiracy. Of those 73 some were from Donna, others to her, with the other party to the conversation either Del Vecchio or Falcone, both, of course, co-conspirators. Having concluded, not without basis, there was a very close relationship between Donna and Falcone, the agents had a right to intercept at least a portion of such conversations until, from the content, they could ascertain that in that particular conversation no pertinent information would pass. The Government analysis of these calls, which the defendants do not seriously challenge, indicated that of the 73 calls, 36, or about 50 percent, were minimized to a greater or lesser degree. It is obvious that certain of the conversations could be, as the Government claims, drug related. Moreover, several of the calls which were not minimized were of very brief duration, e. g., September 5, September 7 (2), September 10, September 11 (3 of 6 calls), September 19, September 20, October 2, October 9, October 10, October 11 (2). Given the fact that the Government had a solid basis for believing that the conspirators were using one or more women, the fact that she conversed both with Del Vecchio and Falcone, and, finally, because of the nature of several of the calls, I could perhaps even sustain recording of all of the conversations in their entirety. Certainly the agents acted reasonably in minimizing as many—and as much—of the calls

3. The Government analyses are, in my judgment, not only at least as accurate as defendants', but are presented in a more comprehensible way, and, by grouping the calls by persons involved and in chronological order, more truly reflect the situation as it confronted an agent on any particular day as he had to determine who was calling and what instructions were applicable thereto. As to the accuracy of the Government figures, I gave defendants 48 hours from receipt of the Government briefs to advise me of any inaccuracies. No response was forth-

coming. Accordingly, I shall rely upon these figures except to the extent my own analysis substantially differs therefrom. Among the figures I so accept is the Government calculation that 145 of 1183 total completed calls were related to the conspiracy under investigation.

The Government characterization of these defendants as "conspirators" and "co-conspirators" is adopted herein for purposes of ready identification and an understanding of the reasonableness of the conduct of the agents.

as they did. Carrying my analysis further, there were approximately 230 calls between Del Vecchio and Janice Mende. The defendants concentrated much of their ammunition on these during the minimization hearing, playing the recordings of many of such calls. I must reject the conclusion that defendants would have me draw respecting these calls, that the Government violated the minimization requirement with respect thereto. Deferring for a moment a statistical study of these .calls, I note once again Del Vecchio's status as an alleged conspirator close to Falcone; that Mende, alleged by defendants to be Del Vecchio's paramour, knew Falcone as well; that both Falcone and Del Vecchio were aware that she knew the other; that she knew of an association of some kind between Del Vecchio and Falcone; that Mende placed calls to Del Vecchio from Falcone's apartment; that on several occasions Falcone called Mende looking for Del Vecchio; that the nature of the relationship between Del Vecchio and Mende was obviously so intimate that the agents could reasonably believe that Del Vecchio would freely convey information to her about his activities and that, at the very least, Del Vecchio would be obliged to disclose certain details of his activities to her when they interfered with his seeing her. Indeed, the agents were able to match up certain statements made in such conversations which aided in the investigation, e. g., that he would be or had been driving for several hours (at a time when the agents could relate this to an auto trip to Montreal) and that he was involved in "dangerous" work. The agents could reasonably have believed that at any time Del Vecchio or Falcone might make further disclosures to Mende; introduce her to others in the alleged conspiracy; invite her on a trip to Montreal, etc.

■ Notwithstanding the foregoing bases for listening to all of the telephone conversations between Falcone and Del Vecchio on the one hand, and Mende on the other, the agents, in my view, conducted themselves with admirable restraint and, in the perspective framed by the facts as they were gathering as the investigation proceeded, did not violate my minimization directive.

On or about September 12, 1972, Campbell placed Mende's name on the charts of instructions—and on the card attached to the recording machine—and indicated that calls involving Mende should not be intercepted. Yet it is also clear that, by oral instructions, Campbell changed this direction as the investigation took one turn and then another.

It is appropriate to note at this juncture that Campbell believed that a call between a conspirator and a clearly established non-conspirator was not as a rule to be recorded. I do not regard minimization under the statute or my Order as requiring this limited view. Conversations of this nature may often be highly significant to an investigation of a far flung and sophisticated conspiracy such as this is alleged to be. The non-conspirator may, in fact, become a conspirator in the near future or even during the very call being monitored. The non-conspirator may, however innocently, aid the other party in furtherance of an illegal objective by, for example, making travel arrangements, or arranging financial assistance for the illegal enterprise. Also, as I have indicated, the conspirator may either volunteer information or respond to innocent questions with highly incriminating answers.

■ It is my view that Title III of Public Law 90–351 contemplates that conversations between conspirators and non-conspirators may be intercepted by authorized electronic surveillance. The crimes for which the statute is designed require that some conversations between conspirators and non-conspirators will be overheard. 18 U.S.C. § 2516 (1970). For example, in order to establish a violation of 18 U.S.C. §§ 892, 893, or 894 (extortionate credit transactions), it is essential that conversations between the victim and the wrongdoer be intercepted. To establish violation of 18 U.S.C. § 1955 (prohibition of gambling enterpris-

es), it is necessary to overhear the bettors placing bets with the members of the illegal gambling business. In both these examples, the contemplated interceptions would reveal conversations between non-conspirators and conspirators. The Senate Committee which recommended passage of Title III stated in their report to the Congress:

[T]he President's Crime Commission found in their report "The Challenge of Crime in a Free Society" (1967), that under "present procedures too few witnesses have been produced to prove the link between criminal group members and the illicit activities that they sponsor." Victims do not normally testify for they are already in bodily fear or they are compliant, that is, the narcotics addict in desperate need of a "fix" does not usually turn in his "pusher". What victim of extortion will unsolicitedly risk his body by cooperation with law enforcement? Insiders are kept quiet by an ideology of silence underwritten by a fear, quite realistic, that death comes to him who talks.

S.Rep.No.1097, 90th Cong.2d Sess. (1968) in 1968 U.S.Code Congressional and Administrative News, p. 2160.

■ With these realities in mind, it becomes clear that a blanket prohibition of these types of interceptions, that is, calls between conspirators and non-conspirators, is not required or, for that matter, reasonable. Rather, the monitoring agent and thereafter the reviewing court must consider many factors, including the precise relationship of the parties, the length of the relationship, the number of calls between the parties, the state of the investigation, activities, at the time, of the alleged conspirator who is a party to the conversation, and the content of the conversations to determine the appropriate degree of minimization.

Of the approximate 230 calls between Del Vecchio and Mende, and Falcone and Mende, 178 were minimized to a greater or lesser degree, and the non-minimized calls were to a considerable degree of very brief duration, one minute or less. Not uncharacteristic of the monitoring was what occurred on August 31, 1972, and September 2, 1972. On the first day the agents recorded only 30 seconds of a 6 minute conversation. On September 2, the agents recorded only 25 seconds of a 17 minute conversation. Also, on September 5, the agents recorded only 1 minute of a 17 minute conversation. On September 9, only 10 seconds of a 13 minute call were recorded. On September 11, only 40 seconds of an 11 minute conversation were recorded. On September 13, 1972, the following calls, by length and by recordation, occurred and were monitored:

| 8 min. | 25 sec. |
| 5 min. | 30 sec. |
| 7 min. | 36 sec. |
| 6 min. | 20 sec. |

On September 14, 1972, the following occurred, by length of call and recordation:

| 5 min. | 36 sec. |
| 1 min. | 7 sec. |
| 20 min. | 20 sec. |
| 1 min. | 1 min. |
| 3 min. | 20 sec. |
| 2 min. | 20 sec. |
| 5 min. | 6 sec. |
| 3 min. | 20 sec. |
| 5 min. | 45 sec. |
| 1 min. | 6 sec. |

On the other hand, there were calls between Del Vecchio and Mende, and Falcone and Mende which were recorded in their entirety. Thus, on September 30, and October 7, 1972, Falcone called Mende trying to locate Del Vecchio after he, Falcone, had received calls from Dasti. On October 8, 1972, Falcone again called Mende to locate Del Vecchio and told her of an important call which the agents related to a call from Dasti. These were all recorded in their entirety. I cannot fault the agents in this regard. My reaction is the same to those

calls between Mende and Del Vecchio recorded in their entirety.

Under all the circumstances, including the utilization the agents suspected the alleged conspirators were making of women, I find that as to this block of calls, once again, my Orders and the statutory directive as to minimization were not violated.

█ Campbell had directed that calls between husband and wife should not be intercepted. Approximately 75 calls were intercepted between Del Vecchio and his wife, Ellen. Only six of these were not minimized to some degree. Given the matter of identification and the understandable human lapses, including inattention, this certainly is not a violation of standards of reasonableness under the minimization requirement, particularly when considered with the overall conduct of the monitoring by the agents.

There were 11 calls between Falcone and his wife, Edith. Ten were minimized, over half of which were minimized in 30 seconds or less.

There were six calls between Del Vecchio and his lawyer's office. Four were minimized in less than one minute. The two which were not minimized lasted, respectively, one minute, and 40 seconds.

I find most apt the following evaluation of the conduct of monitoring agents in United States v. Focarile, 340 F.Supp. 1033, 1047–1048 (D.Md.), aff'd. sub nom., United States v. Giordano, 469 F. 2d 522 (4th Cir. 1972).[4] District Judge Miller stated:

> Section 2518(5), as has been seen, requires the intercept procedure to be conducted so as to reduce to the smallest possible number the interception of "innocent" calls. In this context the word "possible" means "feasible" or "practicable" while still allowing the legitimate law enforcement aims of the statute to be accomplished. This is but another way of saying that the methods and efforts utilized in minimization must be reasonable, the traditional and acceptable standard of measuring the validity of a search under the Fourth Amendment, Berger v. New York, supra, 388 U.S. at 53, 87 S.Ct. 1873, and must allow ". . . no greater invasion of privacy . . . than [is] necessary under the circumstances." Berger v. New York, supra, at 57, 87 S.Ct. at 1883; Katz v. United States, supra, 389 U.S. at 355, 88 S.Ct. 507.

\* \* \* \* \* \*

In the present case the primary purpose of the wiretap was not to accumulate evidence against Giordano, but rather to determine the scope of the alleged narcotics conspiracy and to determine its method of operation, all of which was unknown on October 16, 1970. (Tr. 12:2063). Thus all individuals whom Giordano called or who called him at that time were putative defendants. It had already been established through the calls by the confidential informant to Giordano with BNDD Agent Ambrose listening that Giordano used the telephone to some extent to arrange for sales of narcotics. But as the government has pointed out, this increased the minimization problem because upon the decision to cease monitoring certain individuals, those individuals could no longer be considered defendants since "selective" monitoring of their conversations with Giordano would destroy the evidence value as to them. Decisions on minimization became more difficult in light of the substantial number of calls involving gambling which would appear to be subject to interception under §§ 2516(1)(c) and 2517(5). In addition Giordano had a number of calls to and from women, a circumstance which the BNDD agents did not know were "innocent" calls initially since it was their general experience that narcotics dealers frequently made wide use of their women in furthering their narcotics traffic.

4. Cert. granted, 411 U.S. 905, 93 S.Ct. 1530, 36 L.Ed.2d 194 (1973).

(E. g. Tr. 12:2060–68). Similarly, BNDD agents in their experience felt that, particularly in drug traffic, many seemingly innocuous calls in general contained information pertaining to the drug operation. (Tr. 12:2060).

■ As I have indicated, there is no doubt that non-pertinent conversations were recorded. However, applying the yardstick of realism, it was impossible for the agents to eliminate all non-pertinent conversations, particularly in an electronic surveillance such as this one involving numerous defendants speaking in coded and guarded conversations who, it is alleged, spoke about a large-scale international narcotics conspiracy. This problem was recognized by Judge Pollack in his decision in United States v. Tortorello, 342 F.Supp. 1029, 1038 (S.D. N.Y.1972), aff'd, 480 F.2d 764 (2d Cir. 1973):

> Obviously, some non-pertinent items crept in because they were recorded before a determination of their relevancy could be made. Other such items were included because they appeared in conversations also containing pertinent items. Still others represented a determination of pertinence with which the Court does not necessarily agree. However, overall, the excess items were *de minimis* and the compliance reasonably conformed to adequate rules set down for the intercept. See United States v. King, 335 F.Supp. 523 (S.D.Cal.1971) rev'd on other grounds, 478 F.2d 494 (9th Cir. 1972); cf. United States v. Scott, 331 F.Supp. 233, 246 (D.D.C.1971).

It is often impossible to determine if a particular telephone conversation would be irrelevant and harmless until it has been terminated. Frequently two individuals using the telephone will discuss social matters or items of general interest before getting to the precise point which is to be covered in the call.

The courts which have considered the question of minimization have held that some non-pertinent, innocent, and unrelated calls may be received without causing suppression of the fruits of the electronic surveillance. United States v. Fino, 478 F.2d 35 (2d Cir. 1973); United States v. Cox, 462 F.2d 1293 (8th Cir. 1972); United States v. Lanza, 349 F. Supp. 929 (M.D.Fla.1972); United States v. Mainello, 345 F.Supp. 863 (E. D.N.Y.1972); United States v. Focarile, 340 F.Supp. 1033 (D.Md.), aff'd sub nom., United States v. Giordano, 469 F. 2d 522 (4th Cir. 1972); United States v. La Gorga, 336 F.Supp. 190 (W.D.Pa. 1971); United States v. King, 335 F. Supp. 523 (S.D.Cal.1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973); United States v. Leta, 332 F.Supp. 1357 (M.D.Pa.1971); United States v. Scott, 331 F.Supp. 233 (D.D.C.1971); United States v. Sklaroff, 323 F.Supp. 296 (S. D.Fla.1971).

■■ The statute does not prohibit the interception of non-pertinent calls, but requires that the Government agents exercise, in good faith, reasonable effort to minimize the extent of these intrusions. United States v. Lanza, *supra*. Law enforcement officials, under supervision of the court, must adopt and follow procedures intended to reduce, as best as possible, the unnecessary monitoring of innocent calls. In United States v. Leta, *supra*, 332 F.Supp. at 1360, the court stated that "nearly continuous seizure (conducted in accordance with the requirements of 18 U.S.C. § 2518(5) . . .) of the defendant's phone conversations may protect the defendant from having these conversations edited to his detriment or having statements taken out of context." The court stated that 100 percent interception would not necessarily make the seizure unreasonable, if an effort were made to minimize where possible. If no attempt is made to minimize the unrelated calls, and 100 percent of the conversations are overheard, the interception may be invalid. United States v. Scott, *supra*. But where a good faith reasonable effort has been made to minimize the interceptions, the interception will be valid

even though some calls of a non-pertinent nature were monitored.

In United States v. Fino, *supra,* 478 F.2d at 37, the Second Circuit upheld the electronic surveillance stating:

> Appellants urge that the wiretap orders conferred broader powers than are authorized by the minimization requirements of 18 U.S.C. 2518, and that the agents in executing the wiretaps exceeded the limits imposed by the orders. As to the scope of the orders the appellants' principal point is that the orders did not specify in detail the exact methods the agents should use in minimizing interception of communications of which the interception was not authorized. The orders did in fact contain a considerable amount of specification (for example as to the hours of the day when the telephones could be tapped). Appellants do not suggest what additional specification should have been included. As the government points out it was impossible for the court to provide detailed definitions of the types of conversations which should be intercepted, since the exact contents of the conversations could hardly be known in advance of listening to them at least in part. Under these circumstances general instructions on minimization are to be considered as compliance with Section 2518.

In United States v. Cox, *supra,* 462 F.2d at 1301, the Eighth Circuit upheld the electronic surveillance stating:

> Under these circumstances, the only complaint that can be made against the breadth of this wiretap is that the inherent nature of strategic electronic surveillance renders it unusable in investigating organized criminal conspiracies such as that in this case. As we demonstrated above, that clearly was not the conclusion of the framers of Section 2518(5). Congress apparently concluded, as did Judge Weis in United States v. La Gorga, *supra,* that:
>
> > it is often impossible to determine that a particular telephone conversation would be irrelevant and harmless until it has been terminated.
> >
> > . . . . . .
> >
> > It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, the monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction the conversation will take."

336 F.Supp. at 196.

Accordingly, the motions made to suppress the conversations intercepted herein for alleged want of minimization are denied.

Defendants devoted no part of the hearing to an analysis of the recordings on the Philadelphia electronic surveillance. Based upon the documentation, including the applications, affidavits, and orders I find that the minimization requirements of the instant and Judge Davis' Orders were not violated.

Agent Di Stefano was present at the intercept site nearly nine hours a day during the course of the intercept and reviewed the logs daily, listening as well to the copy tapes of conversations he did not hear. He instructed the other monitoring agents orally as to the conversations that were not to be intercepted. Overall, 292 calls were intercepted, of which approximately one-half were completed calls. Of these, 56, or about 40 percent, were conspiracy related calls. Other calls included those where Licata, the subject of the investigation, unsuccessfully tried to reach others allegedly in the conspiracy with him. Some 26 calls were intercepted between Gaetano Licata, the subject of the electronic surveillance, and his girl friend Michelle D'Ambrosio. Of these 26 calls, 23 were minimized in some degree. On one call the listening device functioned but the recorder failed to record, and this was noted on the log. There were 11 calls in

which the listening device failed and nothing was recorded, again as noted on the logs. Fifty calls were minimized, equal to 35 percent of the total number of calls, and 58 percent of what the Government concedes were non-pertinent calls.

All that has been earlier said by me concerning the New Jersey surveillance applies equally to the Philadelphia surveillance. Indeed, even the post-hearing briefs submitted by defendants do not attack the latter on the minimization issue.

Accordingly, I find the minimization requirement met as to the Philadelphia electronic surveillance.

Defendants during the hearing raised a question concerning the written reports submitted to Judge Davis and me with respect to the interceptions.

It appears from an examination of the interception Orders, issued both by me in Newark and by Judge Davis in Philadelphia, as well as from the testimony at the hearing, that reports were to be submitted to the authorizing judge at five-day intervals. Since applications for extensions in the New Jersey intercept were made either during or at the end of a five-day period, the total number of intercepted calls reflected in the five-day reports was less than the total number of calls intercepted pursuant to my Orders. The reports of Special Attorney Stephen Stein to Judge Davis in Philadelphia did not set out a specific number of calls intercepted; however, this is not necessary to describe the progress of the electronic surveillance.

There is no statutory requirement that five-day reports be submitted throughout the course of an interception or that the total number of interceptions be reflected in five-day reports. The statute in fact contains no requirements as to the submission of periodic written reports to the supervising judge. United States v. Ianelli, 477 F.2d 999 (3d Cir. 1973).

In the *Ianelli* case, *supra* (at 1002) the Court of Appeals for this Circuit in stating and deciding the issues raised on appeal, used the following language:

. . . The sufficiency of these reports was a matter for the supervising judge, and the breadth of his discretion must be viewed in light of the fact that he could under 18 U.S.C. 2518(6) have dispensed with progress reports entirely. See United States v. La Gorga, 336 F.Supp. 190, 194 (W. D.Pa.1971). We find no error.

In United States v. La Gorga, 336 F. Supp. 190, 194 (W.D.Pa.1971), the court stated:

It developed at the hearing that no written reports had been submitted to either Judges Sorg or Gourley but that on the dates set, Bruce A. Burns, the special attorney assigned to the case, had orally advised the two judges that the objectives had not yet been achieved. The attorney did not enumerate the specific number of calls intercepted in any report to the two judges. Clearly, the statute does not insist that these reports be in writing nor by its terms does it specifically require any reports at all. The matter is one for the discretion of the issuing judge and we therefore find no error in the use of oral reports rather than those in writing. While the defendants point out that the guidelines prepared by the Justice Department speak of written reports, such a requirement does not have binding force as law. It would seem, however, in light of the objections raised in this case to the use of oral reports that it would be better practice in the future to have communications submitted in writing as departmental policy apparently now urges.

Thus, the reports submitted were not deficient in the respect urged.

In addition to the minimization aspect, the defendants also urge suppression on the ground that the Government, in obtaining Title III Orders from this Court and from Judge Davis, violated statutory requirements when, in stating that normal investigative procedures

reasonably appeared unlikely to succeed if tried [18 U.S.C. § 2518(1)(c)], the Government's application was devoid of factual support, and omitted certain significant information concerning Del Vecchio.

The statements in the applications, regarding "normal investigative procedures," taken alone, are not a "full and complete statement" under § 2518(1)(c). However, the Campbell affidavits, submitted with the applications and incorporated therein by reference, supplement the aforementioned statements of the applications. Thus Paragraph 4(a) of the affidavit in support of the August 28, 1972, application reads as follows:

> Information concerning the activities of Pasquale Falcone was supplied by the RCMP (Royal Canadian Mounted Police) and very little is known of his operation. In addition, the suspect has never been arrested and little intelligence is available regarding his mode of operation or associates by Agents of this Bureau or of other law enforcement agencies. Periodic surveillance of the suspect, his home, haunts and associates have not been helpful or useful in obtaining additional information. Moreover, information available indicates that Pasquale Falcone only conducts his illicit activities with a few selected and trusted confederates and there is no informant available to the Bureau who is in a position to supply or assist in obtaining sufficient evidence of the suspect narcotics activities.[5]

*See also,* Campbell affidavits of September 15, 1972, and October 5, 1972.

█ The above statement represents substantial compliance with the statutory imperative, particularly when it is considered in the context of a narcotics investigation of this kind. Moreover, the remainder of Campbell's August 28 affidavit, an additional four pages, fleshes out paragraph 4(a) sufficiently to assure that the informative function of a § 2518(1)(c) statement is fulfilled.

Thus, paragraph 5 of the Campbell affidavit provides vital background information. The data, received from non-electronic sources, allegedly indicate a heroin "pipeline" extending from defendant Frank Dasti in Montreal to defendant Falcone in the United States. Moreover, a previously installed pen register, approved by Judge Coolahan on July 28, 1972, traced substantial numbers of calls made from the Falcone telephone to known narcotics sources and possible conspirators. Finally, intelligence allegedly received from Canadian authorities suggested that shipments of heroin would "go down the pipe" on August 30 or 31, and that a *telephone* was to be used to implement the scheme. In short, crediting the information, as the agents had a right to do, the pattern of telephone calls to those tied to narcotics, taken together with the information from Canada regarding telephonic arrangements for narcotic shipments, could reasonably lead agents, attorneys, and this Court as well, to the conclusion that the operation was keyed to the telephone to such a great extent that further investigation would be futile, absent interception of the Falcone calls.

█ Furthermore, the statute does not require that alternate means of investigation, in fact, be tried; the wiretap is not reserved for use only as a last resort. United States v. Askins, 351 F. Supp. 408 (D.Md.1972); United States v. Whitaker, 343 F.Supp. 358, 362–363 (E.D.Pa.1972), rev'd on other grounds, 474 F.2d 1246 (3d Cir. 1973); S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Admin. News, pp. 2112, 2190.

Thus there is no basis for suppression of wiretap materials obtained under my Orders.

As to the Philadelphia materials, the application on November 30, 1972, to Judge Davis for an electronic surveillance Order simply stated that "normal investigative procedures reasonably appear unlikely to succeed if tried."

---

5. The mention of an "informer" will be hereinafter covered in detail.

There was no mention made in the application of any other investigative procedures that were employed; however, there is a description of the course of the investigation embodied in the agent's supporting affidavit, particularly paragraph 4 thereof. Given that information, and with the understanding that in a heroin smuggling investigation ordinary methods of investigation are usually unavailing, it is my view that there was substantial compliance with the statutory requirement when the application and the affidavit are read together. Accordingly, this aspect of defendants' motions is also denied.

 I next turn to defendants' contention that the Newark and Philadelphia applications should have disclosed, particularly in connection with the § 2518(1)(c) requirement, that Del Vecchio was, in the case of the Newark application, a "possible informer," and in the Philadelphia application, that he had been developed as an informer by agents working on the Newark case. Some detailing of the evidence is necessary to an understanding (a) of the true nature of defendants' position and (b) that their position is not well taken. My findings of fact on this matter accordingly follow.

The Government BNDD (now DEA) Assistant Regional Administrator, Hunt, met Del Vecchio in July 1972, at a meeting arranged by Detective John McElroy of the North Bergen Police Department who advised Hunt that Del Vecchio had certain information and desired to cooperate with the Government. Present at the meeting were Hunt, Group Supervisor Thomas Devine of the BNDD, McElroy and Del Vecchio. McElroy advised Hunt that Del Vecchio had worked for him previously in narcotics investigations and was a good man. Del Vecchio indicated that he knew two individuals who resided in Manhattan who were involved in cocaine trafficking, and furnished their telephone number. Hunt expressly and specifically asked Del Vecchio if he knew anyone else, either in New Jersey or New York, who was involved in the illicit sale or distribution of cocaine, heroin, or other narcotics. Del Vecchio's response was in the negative.

BNDD obtained subscriber information on the telephone in question; and on September 11, 1972, this case was formally assigned for preliminary investigation, but nothing else was developed in the case, although the Government at the hearing before me stated the file was still open.

Hunt assigned Devine to meet further with Del Vecchio on the cocaine matter but Devine, though he made several telephone efforts to arrange meetings with Del Vecchio, was unable to make an appointment. It is noted, incidentally, that unfortunately Devine was shot in an unrelated case in early October.

Although the Newark office of BNDD under Hambrick had been investigating Falcone and Dasti since February 1972, the name Del Vecchio had meant nothing to Hunt when they met in late July 1972. He did not therefore convey information to Hambrick about his meeting with Del Vecchio until early September 1972. The reason for his doing so then arose out of these circumstances.

Hambrick, on or about September 7, reported to Hunt that Del Vecchio had made an intercepted call to McElroy on or about that date. Hambrick's interest was primarily in what to do with a situation where one now strongly suspected of being involved in a substantial heroin smuggling conspiracy was obviously acquainted with a police officer.

Within a day, Hunt and Hambrick had verified this was the same Del Vecchio with whom Hunt had met the preceding July. This created an obvious problem. The two agents now knew that Del Vecchio had been, to put it charitably, less than candid in the July meeting, when he disclosed names of two cocaine traffickers, but denied knowing anything of any other narcotics activity, a reticence highly significant in light of the Newark office investigation of Fal-

cone, Dasti, et al., underway since early 1972.

The policy decision was to continue with the electronic surveillance and not to approach McElroy at this point.[6]

I can readily understand why Hunt and Hambrick were suspicious of Del Vecchio and extremely doubtful of his reliability. Knowing of Del Vecchio's involvement in the Falcone investigation, based upon the numerous intercepted telephone calls in which Del Vecchio participated, Hambrick could only but wonder why Del Vecchio would have approached Hunt in late July and given information about two men involved in cocaine without furnishing information concerning the heroin conspiracy and mentioning the names of Falcone and Dasti and others. It is also clear to me that when Hambrick and Hunt heard that Del Vecchio had telephoned McElroy in early September, they had a very difficult decision to make. Their investigation was moving along satisfactorily. While at an early stage, its contours nonetheless were beginning to form, and Hambrick, obviously an experienced investigator, and Hunt, equally experienced, and a veteran in law enforcement in the highly sophisticated drug trade, had good reason to believe that there was a possibility that Del Vecchio might be attempting to learn BNDD methods of operations by furnishing information on a low level violator or indeed erroneous information on another subject. Hambrick had been advised that Del Vecchio had indicated in the late July meeting that he knew nothing other than the two cocaine violators in New York. Hambrick was also advised that there had been several unsuccessful attempts to set up meetings with Del Vecchio in the intervening period after the end of July, but that for some

reason or another these appointments were never kept by Del Vecchio.

Gregorie was not advised at this time of the July 1972 meeting Hunt had had with Del Vecchio; but knowing of course of the September call to McElroy, Gregorie directed Campbell to investigate the possibility of a relationship between McElroy and Del Vecchio.

It is of some help to an understanding of the defense position to point out exactly what it is that defendants are urging: that the agents should have told Gregorie on or about September 7, of the possibility that Del Vecchio might become an informant in the investigation then under way and that given this information Gregorie might have been able to take action to exploit Del Vecchio as an informant. The difficulty with this approach is that it requires me to intrude into the investigation by hindsight. Nonetheless, risky though the journey is, I am willing to embark upon it. Analysis of the situation leads me to conclude that the agents acted prudently. Experienced as they were, and having every reason to doubt Del Vecchio's integrity and veracity in view of his having withheld information concerning the alleged heroin conspiracy from them in late July, they had no reason to suddenly decide that Del Vecchio was now going to become an informant, and at the very least they had no reason to take steps which would prejudice the investigation that was now well along. Meantime of course the agents were not idle. Devine was to continue to try to set up some meetings with Del Vecchio to further explore the information concerning the cocaine violators. His efforts continued to be fruitless.

The defendants further suggest that there was a lack of communication between the agent on the one hand and the supervising attorney on the other, on or

---

6. The Government attempted to have Hunt explain why he felt the interception should be continued after September 8, 1972, notwithstanding the telephone call from Del Vecchio to McElroy. All defense counsel objected at this point and this Court sustained the

objection. Further reflection leads me to believe that the Government should have been permitted to present this evidence. However, in view of my overall determination, no injury has been done to the Government's position by my ruling.

about September 7, as concerns the Hunt-Del Vecchio meeting in July. They suggest that if Gregorie had been given this information, he might have taken additional investigative steps. They also suggest that it was apparent, at least by early September, that Del Vecchio was a possible informer and that exploitation of him in this capacity was an investigative step that should have been taken before further electronic surveillance was conducted. The essence of the defendants' position is found in this question: "Did you know whether or not as a fact, sir, that [sic] you had tried [to contact Del Vecchio] that Mr. Del Vecchio would not have been an informant in September 7th or 8th?" (Tr. 1979).

Gregorie answered the question by pointing out that going to Del Vecchio to determine if he would become an informer that early would have the potential for disaster insofar as their investigation was concerned. He pointed out that Del Vecchio well might have gone back to the participants in the alleged conspiracy and disclosed that the investigation was on and at this point there was just not enough information on the informant's background or his reliability or even the amount of the information that he had that was good information that would have been useful in the investigation. I further find based upon the entire context of the hearing and the caution with which agents must move and the care and scrupulousness with which they evaluate and sift information, the significant from the insignificant, the relevant from the irrelevant, that there was no substantial departure from good investigative practices when BNDD failed to convey to Gregorie in early September the news of the meeting with Del Vecchio in late July. I also find that Gregorie's response to the defendants' suggestion was faultless.

It is further noted that in the initial application to me it is stated by the Government that there were no informants available. I do not find anything misleading in this failure, if it be a failure, to convey to me the fact that Del Vecchio had had the aforesaid meeting in late July with Hunt, in the light of all that is hereinabove set forth concerning what took place after that meeting.

On October 8, 1972, Del Vecchio called Hunt but did not reach him. Trying again on October 9, he was successful. Thus the agents' decision of early September was vindicated: Del Vecchio had now come to them. He advised Hunt he wanted to see him on a matter unconnected with what they had earlier discussed, and a meeting took place on October 11, 1972. Del Vecchio at this meeting indicated that he had a friend named Pat—he refused to divulge his last name—who was involved in heroin traffic with an individual in Canada named "Desti." No other names were furnished by him.

By this time, i. e., October 11, Hunt was aware that Del Vecchio was being recorded in the Newark electronic surveillance office of the BNDD. Hunt knew "Pat" was Falcone and that "Desti" was Dasti.

Del Vecchio indicated that he would attempt to determine when he would be in a position to interdict a shipment of heroin originating in Canada and destined for an unnamed individual or individuals in New Jersey with whom "Pat" was connected, and that when and if he obtained that information he would communicate it to Hunt. Hunt advised Hambrick what took place at this meeting. It was decided after this that a further meeting should be held with Del Vecchio. It was intended that it be held on October 13, but it was at that time that Devine was shot and he was unable to meet with Del Vecchio. The investigation following the shooting led to the meeting being postponed until October 18, at which time, and for several days thereafter, the debriefing of Del Vecchio took place with Campbell and other agents present. Again it is noted the Newark electronic surveillance had ceased. Subsequently Campbell advised Hambrick that Del Vecchio had admitted that Dasti was involved in a heroin con-

spiracy with Falcone; that Del Vecchio had identified Dasti; and that he had identified one other photograph as someone he knew by the name of Gay, who was in fact Gaetano Licata. Del Vecchio further stated at this time that he did not know of any involvement of Licata in the Dasti-Falcone conspiracy.

Based upon these facts, and the inferences to be drawn therefrom, I deny so much of defendants' motions to suppress the Newark materials as are based upon an alleged failure of the Government to advise me of Del Vecchio's so-called "special" status.

My conclusion is the same as to the Philadelphia materials. In this connection, from and after October 18, 1972, memoranda were prepared by the agents of their debriefing of Del Vecchio and were sent to the Philadelphia agents working on the Licata case. Also, Hambrick, about mid-November, held discussions with other agents concerning Del Vecchio's value in the investigation of Licata. Based upon all the information before him, Hambrick decided that Del Vecchio could be of no value to the Philadelphia office of BNDD in the Licata investigation. He felt that if any effort were made to insert Del Vecchio as an informant in the Licata investigation it would have put him out of character for all he had done was function as an underling for Falcone and only Falcone. In effect he had been nothing more than an "answering service" between Falcone and Licata. He did not have Licata's telephone number and did not know where Licata lived. He had been with Falcone on only one occasion when Falcone met with Licata and even on that occasion had been dismissed when they discussed their business in a different section of the house in which they were meeting. All in all Hambrick had concluded that if BNDD attempted to use Del Vecchio as an informant in the Licata investigation it might jeopardize the entire investigation, not only against Licata but against Falcone as well. Hambrick's evaluation of the overall situation concerning Del Vecchio's usefulness and the decision that he would be of no value to Philadelphia was conveyed to Philadelphia.

Di Stefano, the BNDD agent in Philadelphia, was advised that Del Vecchio had become an informant in the Newark investigation, although it is noted that he did not agree to testify until February 1973. Whether or not Hambrick's evaluation was available to him, Di Stefano made his own evaluation of whether Del Vecchio could be valuable as an informer in the Philadelphia case against Licata. His determination that Del Vecchio had no value was, in my judgment, quite obviously correct. The brief and only meeting between the two —and the infrequent telephone contacts —offered no reasonable basis for hope that BNDD could advance the Licata case through Del Vecchio's aid. Moreover, to attempt to utilize him might have destroyed his usefulness where it was significant, in the Newark case.

 Under all the circumstances, and applying once again the test of reasonableness, I do not perceive that there was a statutory requirement commanding that a judge be advised of *every* possibility of aid to investigation other than electronic surveillance. Accordingly, I find no basis for declaring that the Di Stefano affidavit was deficient in any substantial respect because it did not embrace mention of Del Vecchio.

In arriving at this conclusion, I have not overlooked the fact that Di Stefano apparently thought so little of Del Vecchio's value in the Licata case that he failed to convey details of Del Vecchio's informer status to Stein, the Government attorney. Nor do I ignore that Stein testified that, if he had been informed of the situation, he would have thought it should be included in the affidavit submitted to the judge, albeit on the issue of probable cause. Also, Stein testified that had he been given the information in Government Exhibits 15 A, B, and C, he would have asked the agent how close the informant was to Licata. The answer to this is apparent, not at

all close. However, I need not indulge in hindsight analysis of what the Government agent and attorney omitted to convey to each other and the significance thereof, except, perhaps, to say that I think that the agent was guilty of a mistake in judgment in not giving Stein the Del Vecchio information. The only question I must be concerned with is whether there was a statutory violation in this regard. I find none.

Defendants further move for suppression on the basis that certain requirements imposed upon the supervising attorney by the Department of Justice Manual for the Conduct of Electronic Surveillance (Exhibit G–10), namely, the submission to the attorney of a daily memorandum regarding nonrelated but monitored calls, the making of daily verbatim transcripts of all reported calls, and the transporting of tapes to the supervising judge for sealing, were not met.[7] The Government freely concedes that certain of the requirements of the Manual were not met. These admissions, however, do not warrant suppression.

Defendants are unable to cite any authority in support of the proposition that the *Manual* in any way has the force and effect of law. On the other hand, courts to whom the issue has been presented have held that they are in no sense even of the dignity of regulations and, accordingly, they must yield to the instructions and order of the supervising judge. United States v. Bynum, 360 F.Supp. 400, 406 (S.D.N.Y.1973); United States v. La Gorga, 336 F.Supp. 190, 194 (W.D.Pa.1971); *cf.* United States v. King, 335 F.Supp. 523, 541 (S.D.Cal. 1971), rev'd on other grounds, 478 F.2d 494 (9th Cir. 1973). This approach to the question is compelled, moreover, by the fact that the *Manual,* published in 1969, has not been revised to reflect the developing case law in this area. United

States v. Bynum, *supra,* 360 F.Supp. at 406 n. 5.

Thus compliance with the minimization directives of Title III and the Orders of this Court and Judge Davis is to be determined on the basis of my own judgment and application of the relevant statutory provisions, not on what the *Manual* prescribes for standards of conduct of the Justice Department attorneys.

Defendants next urge that the Government gave inaccurate information regarding the number of calls actually intercepted. Again, the Government does not dispute that it reported a number of calls substantially lower than were actually intercepted. The reasons for the discrepancy are twofold. First, the total number of calls submitted by the Government only included the sum of the totals listed on the nine five-day reports required by this Court. Thus, the calls intercepted during the last five days of each 20-day Order period, when only additional affidavits were required, were not included. Second, the total of 97 calls listed on the first five-day report were said to have mistakenly excluded those calls already listed as pertinent to the investigation, a total of 16.

While I agree with defendants that an accurate count should have been made, nonetheless I find no basis, in view of the overall conduct of the surveillance, which would warrant suppression. The number of calls actually reported presented a fair picture for me to assess the progress being made. Moreover, some human error is to be reasonably expected when agents are burdened with the task of counting hundreds of individual log sheets while still performing their duties of intercepting and monitoring. Finally, the possibility of bad faith in this situation is all but eliminated by the fact that the original

---

7. 18 U.S.C. § 2518(8)(a) (1970), states in relevant part:
 Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.

log sheets were then as now available for an accurate count.

Next, defendants' position is that every district judge who signs a Title III Order must thereafter be subject to call by defendants to give testimony as to his supervision of the agents in their carrying out of his Order. Thus, they requested me to testify in this case. I refused to do so since I saw no reason to do so. I did, however, state that which certain testimony confirmed: that my Orders were based only on the written applications and affidavits, judged in the light of the statutory mandate. My Orders required 5-day reports be submitted in writing and they were. I stated at the hearing I did not receive any information orally and that what I did—and Ordered to be done—was in writing in the Orders hereinabove mentioned.

For the foregoing reasons, defendants' motions are denied in all respects.

Submit an appropriate order.